# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| COALITION TO PRESERVE MCINTIRE PARK and DANIEL BLUESTONE, <br><br> *Plaintiffs,* <br><br> v. <br><br> VICTOR MENDEZ, ADMINISTRATOR FOR THE FEDERAL HIGHWAY ADMINISTRATION <br> *Defendant.* | CASE NO. 3:11-cv-00015 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

In this action, the Coalition to Preserve McIntire Park[1] and Daniel Bluestone[2] (collectively "Plaintiffs") seek declaratory and injunctive relief for purported violations of federal law by Defendant Victor Mendez, Administrator for the Federal Highway Administration ("FHWA"),[3] in approving federal funding for a highway project in Charlottesville, Virginia known as the Route 250 Bypass Interchange at McIntire Road (the "Interchange Project"). Plaintiffs contend that the Interchange Project, which calls for the expansion of the existing intersection of the Route 250 Bypass and McIntire Road, will compromise or destroy portions of McIntire Park (the "Park") and adversely affect other natural and historic features found therein and nearby.  The matter is before the Court on cross-motions for summary judgment.  For the reasons that follow, I will deny Plaintiffs' motion and grant Defendant's cross-motion.

---

[1] The Coalition to Preserve McIntire Park is a non-profit, unincorporated conservation organization dedicated to the protection and enhancement of McIntire Park.  It has 36 members on whose behalf it has brought this action, which was authorized by the organization's steering committee.

[2] Daniel Bluestone is a member of the Coalition to Preserve McIntire Park and serves on its steering committee.  He lives on the perimeter of McIntire Park and claims to regularly use its space for recreational purposes.

[3] While Plaintiffs properly named Victor Mendez as Defendant in this action, I will refer instead to the FHWA, which, for purposes of this memorandum opinion, is essentially interchangeable with Defendant.

# I. BACKGROUND

## A. Facts Contained within the Administrative Record[4]

The Interchange Project at the heart of this matter is preceded by a long history of attempts to build roads through and around McIntire Park.  Evidently, what was, decades ago, a more ambitious and comprehensive project has since been scaled back and broken up by the local, state, and federal governmental entities that, to various degrees and at various times, have been involved.  Today, there are essentially three separate projects in and around the Park area.

Northeast of the Park is a 1.4-mile stretch of road known as the Meadow Creek Parkway (the "Parkway"), which extends south from Rio Road to Melbourne Road.  The Parkway, which was funded by Albemarle County and the Virginia Department of Transportation ("VDOT"), was recently completed, and is now open to traffic.

To the southwest of the Parkway would run the proposed McIntire Road Extended (the "MRE"), which is being funded by the City of Charlottesville and VDOT.  It would be built through the eastern half of McIntire Park, thus connecting the southern terminus of the Parkway at Melbourne Road with the Route 250 Bypass at McIntire Road.  However, as currently configured, the MRE would not extend south all the way to the Route 250 Bypass; rather, it would terminate at a point 775 feet north of the bypass.[5]

Finally, there is the Interchange Project, with which this lawsuit is primarily concerned.  The Interchange Project is the only one of the three plans that, if completed, would utilize federal funding.  As its name indicates, the Interchange Project seeks to construct a grade-separated

---

[4] I will refer to "AR" when citing to the administrative record throughout this memorandum opinion.

[5] During oral argument on the motions, the FHWA represented that construction of the MRE has already commenced.  Plaintiffs seemed to dispute this contention, or at least the percentage of the MRE that has purportedly been completed.  In any event, the FHWA's representation with respect to the MRE's percentage of completion is irrelevant for the purpose of resolving the motions before me, for there is no basis in the administrative record (or in the parties' briefs) for it.

interchange at the current at-grade, signalized intersection of the Route 250 Bypass and McIntire Road.   The Route 250 Bypass is a key east-west, four-lane divided roadway that enables motorists to bypass Charlottesville's downtown area and neighborhoods.  AR 7, Bates # 000040. McIntire Road is a two-lane road that runs north from the downtown area and terminates at the Route 250 Bypass.  *Id.*

Although it was originally conceived by the City of Charlottesville and initiated in 2004, the Interchange Project was later added to the Statewide Transportation Improvement Program, which is approved annually by the FHWA.  *See* AR 7, Bates # 000038.  Initial funding was provided by VDOT, and in 2005, Congress earmarked a total of $27 million for the Interchange Project in the Safe, Accountable, Flexible and Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144, 1449, 1506.  *Id.*  Also in 2005, the Charlottesville City Council created a steering committee to offer input on plans for the Interchange Project.  *Id.* at Bates # 000040.[6]

Based on traffic studies, the FHWA determined in 2006 that the intersection was operating at a level of service ("LOS") D during the morning rush hour and a LOS C during the evening rush hour.   AR 7, Bates # 000040.[7]   While these LOS ratings were satisfactory, the

---

[6] In both its Final Section 4(f) Evaluation and in its Revised Environmental Assessment, the FHWA describes the steering committee as follows:

> The role of the Committee has been to provide feedback and make suggestions regarding the development of interchange concepts, detailed interchange alternatives, and a Preferred Alternative, including the assessment of their effects.  The Steering Committee is made up of persons appointed by the Charlottesville Mayor and City Council, including representatives from the Charlottesville City Council, Albemarle County Planning Commission, Charlottesville Planning Commission, Charlottesville Regional Chamber of Commerce, Citizens Committee for City-County Cooperation, Charlottesville-Albemarle Regional Transportation (CHART) Team, Charlottesville Parks and Recreation Advisory Board, the Rivanna Trails Foundation, local architects, and local neighborhoods.

AR 7, Bates # 000040; AR 534, Bates # 004688.

FHWA projected that under future no-build conditions, an at-grade intersection would exist where the Route 250 Bypass, McIntire Road, and the currently-proposed MRE meet, and by the year 2030, volumes of traffic would cause the intersection to operate at a LOS F during both morning and evening rush hours. *Id.* at Bates # 000042.[8] A LOS F is deemed unsatisfactory. *Id.* Even if the MRE were not built, the FHWA concluded, 2030 traffic projections for the intersection under no-build conditions indicate that it would still function at a LOS F. *Id.*

According to the FHWA, the Interchange Project seeks to address five objectives, known as the Interchange Project's "purpose and need." These ends include:

1. Improving roadway and operational deficiencies in the form of traffic congestion, limited capacity, and inefficient traffic operations at the existing intersection of the Route 250 Bypass and McIntire Road intersection as well as within the project area;

2. Improving unsafe motorist, bicycle, and pedestrian conditions for those passing through the project area;

3. Improving deficiencies in community mobility for automobiles, pedestrians and bicyclists;

4. Addressing social demands for creating a gateway into the City of Charlottesville and the Park that is sensitive to the context of its surroundings, minimizes impacts to the environment, and supports existing and planned recreational development; and

5. Constructing a project that is consistent with Congress's desires as represented by its earmark in SAFETEA-LU.

---

[7] Level of service is a measurement utilized by traffic engineers to describe and analyze the effectiveness of transportation facilities such as highways and intersections.

[8] The FHWA also made the following findings:

> The higher than average accident rate that currently exists at the intersection would likely increase as traffic volumes increase. The future no-build condition will have excessive queuing and delays in 2030 that will interfere with operations at nearby interchange ramps (Park Street), corridor merge/diverge areas, and at-grade access points. Automobile mobility will be hampered by failing traffic conditions. Additionally, in the future pedestrian and bicycle mobility will further degrade and multi-modal safety issues will be compounded as traffic increases.

AR 7, Bates # 000042.

*See* AR 7, Bates # 000042; AR 534, Bates # 004690, 004692.  With these purpose and need goals serving as a backdrop, the FHWA undertook a rather exhaustive process of examining several options for improvement of the intersection.

At the beginning of this process, certain design proposals and alternative options for improvement of the intersection were excluded from detailed study because they failed to meet the purpose and need of the Interchange Project.  AR 534, Bates # 004693–94.  Thereafter, a no-build alternative and three interchange concepts for improvement of the intersection were presented to the public.  *Id.* at Bates # 004694.  The result was the development of thirteen different interchange alternatives, which were evaluated for their ability to meet the Interchange Project's purpose and need, and then presented to the public in 2006.  *Id.* at Bates # 004694–95.  Of these alternatives, five were retained for more detailed analysis, but only two were carried forward in 2007.  *Id.* at Bates # 004695.  Following a public comment period, discussion with the Interchange Project's steering committee, and a Charlottesville City Council work session, the City Council endorsed Alternative G1 as the preferred alternative in August 2008.  *Id.* at Bates # 004695–96.

Alternative G1, which would meet the purpose and need for the Interchange Project, calls for a traditional diamond-shaped interchange with signalized ramps at McIntire Road.  *Id.* at Bates # 004696.  The central design feature of Alternative G1 is the Route 250 Bypass passing over McIntire Road, hence achieving a grade-separated interchange.  *Id.*  Alternative G1 also proposes a northern spur, extending the existing McIntire Road northward to meet the proposed MRE, which would extend down from Melbourne Road.  *Id.*  According to the FHWA, if the MRE is not constructed, the design of the interchange would be reevaluated.  *Id.*  Overall, Alternative G1 would require approximately 7.8 total acres of the Park (5.5 acres for new

5

roadways and 2.3 acres for trails).[9]  AR 7, Bates # 000053.  The FHWA represents, and Plaintiffs do not dispute, that the new roadways called for by Alternative G1 would result in the paving of 4.1% of the Park's acreage.

Both Alternative G1 and the no-build alternative were carried forward for further analysis by the FHWA.  At that point, it was determined that Alternative G1 would use five properties protected by Section 4(f) of the Department of Transportation Act of 1966[10]: McIntire Park, McIntire Skate Park, Rock Hill Landscape, Charlottesville and Albemarle County Courthouse Historic District, and McIntire/Covenant School.  *Id.* at Bates # 000043.  The impact on the last two of these properties would be *de minimis*.  *Id.* at Bates # 000053.  However, all of McIntire Skate Park would be used,[11] and portions of McIntire Park and Rock Hill would be impacted.  *Id.* at Bates # 000054.

Next, the FHWA considered three total avoidance alternatives and the no-build alternative.  The total avoidance alternatives were designed to avoid all of the Section 4(f) properties.  *Id.* at Bates # 000055.  Avoidance Alternative 1 would improve roadways northwest of the Park; however, it would substantially impact approximately sixty residential properties and require multiple relocations, which would significantly raise the cost of such a project.  *Id.* at Bates # 000055, 000057.  For these and other reasons, and because it failed to meet the Interchange Project's purpose and need, Avoidance Alternative 1 was rejected.  *Id.*

---

[9] Alternative G1 would impact 3.8 acres of forest habitat (4.7 acres including trails).  *See* AR 36, Bates # 000412; AR 6, Bates # 000022.

[10] As I explain in greater detail in Part III.A, *infra*, Section 4(f) serves to protect parkland from federally-funded highway projects.

[11] According to the FHWA, the City of Charlottesville plans to move the modular skate ramps and other facilities presently located at McIntire Skate Park to another location prior to construction of the Interchange Project.

Avoidance Alternative 2, which is favored by Plaintiffs, would improve upon the no-build, at-grade intersection of the Route 250 Bypass and McIntire Road by shifting it to the southwest and expanding the number of through and turning lanes to twenty-four for the four approaches that would prospectively exist at the intersection (assuming construction of the MRE). AR 7, Bates # 000057. However, the FHWA determined that this alternative would in fact require an expansion to twenty-nine lanes in order to adequately address future traffic needs and to achieve an acceptable, non-failing LOS. *Id.* And even if the intersection were not expanded to twenty-nine lanes as such, the FHWA nonetheless concluded that it would not meet the purpose and need of the Interchange Project. *Id.* Therefore, Avoidance Alternative 2 was eliminated from consideration.

Finally, Avoidance Alternative 3 would avoid all Section 4(f) properties by improving roadways east of the intersection. *Id.* The FHWA concluded, however, that this alternative presented problems similar to those raised by Avoidance Alternative 2. Additionally, the FHWA determined that Avoidance Alternative 3 would implicate at least two other historic properties not affected by other alternatives under consideration. *Id.* at Bates # 000058. Accordingly, Avoidance Alternative 3 was rejected. *Id.* Ultimately, the FHWA concluded that there was no feasible and prudent total avoidance alternative to the use of land from certain Section 4(f) properties. *Id.* at Bates # 000059.

Pursuant to 23 C.F.R. § 774.3(c), the FHWA next proceeded to an analysis of which alternative would cause the least overall harm to Section 4(f) properties. Among these alternatives were options that sought to avoid particular Section 4(f) properties (as opposed to the previously mentioned total avoidance alternatives that would avoid *all* Section 4(f) properties). *Id.* at Bates # 000059–62. Ultimately, Alternative G1 was found to cause the least overall harm

to the Section 4(f) properties.  *Id.* at Bates # 000065, 000076.  According to the FHWA, in its latest iteration, Alternative G1 also includes all possible planning to minimize harm to the Section 4(f) properties.  *Id.* at Bates # 000079.[12]

On October 6, 2009, the FHWA released a revised environmental assessment for the Interchange Project and made it available for review and comment.  Subsequently, on September 29, 2010, the FHWA issued a finding of no significant impact, thus determining that an environmental impact statement would not be prepared.  On the same day, after having previously provided the public an opportunity for review and comment, the FHWA released its Final Section 4(f) Evaluation, in which it revealed its selection of Alternative G1 as the best and final design proposal.

### B. Procedural History

On February 22, 2011, Plaintiffs filed the instant action seeking, *inter alia*, to enjoin construction of the Interchange Project under Alternative G1.  Plaintiffs argue that: (1) the FHWA was required to select an alternative alignment that, when compared to the preferred alternative, would have had no or lesser impact on the Park and nearby resources; (2) the environmental review conducted by the FHWA was too narrow in its scope because it did not adequately take into account the cumulative environmental effects posed by the Interchange Project the MRE; and (3) federal law necessitated the preparation of an environmental impact statement for the Interchange Project rather than simply the development of an environmental assessment.

---

[12] In June 2010, a memorandum of agreement was executed by the FHWA, the City of Charlottesville, VDOT, the Virginia State Historic Preservation Office, and the Advisory Council on Historic Preservation.  In it, various steps to further mitigate the harm to Section 4(f) properties caused by Alternative G1 are outlined.  AR 95, Bates # 001605–26.

On April 20, 2011, Defendant filed his answer to Plaintiffs' complaint. Thereafter, the parties compiled an administrative record numbering over 53,000 pages and submitted it to the Court on June 28, 2011. Subsequently, Plaintiffs filed their motion for summary judgment on October 18, 2011, and Defendant filed his cross-motion for summary judgment on November 17, 2011. The issues were fully briefed, and on April 25, 2012, I conducted a hearing on the parties' motions.

## II. LEGAL STANDARDS

Because this matter is before me on cross-motions for summary judgment, I must determine whether the parties are entitled to judgment as a matter of law on the claims raised by Plaintiffs. However, because Plaintiffs are challenging the decisionmaking of a federal agency, the Administrative Procedure Act requires me to conduct this inquiry under a different framework than otherwise typically applies. I set out the pertinent legal standards in turn.

### A. Summary Judgment Standard

A court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The standard is the same for cross-motions for summary judgment. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation and internal quotation marks omitted).

When, as here, a court is reviewing the decision of an administrative agency, a motion for summary judgment "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Kirchbaum v. Kelley*, 844 F.

Supp. 1107, 1110 (W.D. Va. 1994).  Therefore, a movant's "burden on summary judgment is not materially different from his ultimate burden on the merits."  *Id.*  The validity of the administrative decision "is to be determined exclusively on the administrative record," *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977), and the court may not "find" underlying facts. Rather, the only issues presented are issues of law.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–84 (1990); *Celotex*, 477 U.S. at 322.

## B. Standard of Review under the Administrative Procedure Act

In a case such as the instant action, in which a federal agency's decisions are being challenged, a court's review of the claims must be conducted pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.   Under the APA, a court will set aside agency determinations of the sort made here if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A); *see Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004).  An action is arbitrary and capricious if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under this standard of review, a court "must not reduce itself to a 'rubber stamp' of agency action," *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, --- F.3d ---, No. 11-2210, 2012 WL 1548685, at *4 (4th Cir. May 3, 2012) (quoting *Fed. Mar. Comm'n v. Seatrain Line, Inc.*, 411 U.S. 726, 746 (1973)), but rather must decide if the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99 (1977).  While the court's "inquiry into the facts is to be

searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency." *Id.*  Indeed, "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

## III. Discussion

### A. Section 4(f) Claim

Plaintiffs allege that when the FHWA issued its Final Section 4(f) Evaluation, and in so doing selected Alternative G1 as the preferred alternative, it rejected a feasible and prudent alternative project design that would have dramatically reduced or eliminated the need to take parkland and land containing historic sites.

Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303, and section 18(a) of the Federal-Aid Highway Act, 23 U.S.C. § 138, (collectively "Section 4(f)") impose substantive limits on the discretion of the Secretary of Transportation to approve federally-funded projects that use certain protected lands or resources.  Specifically, Section 4(f) prohibits federal approval or funding of a transportation project that requires the use of "publicly owned land of a public park, recreation area, or . . . land of an historic site of national, State, or local significance," unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the [protected property] resulting from the use." 49 U.S.C. § 303(c).[13]  The Supreme Court of the United States

---

[13] The FHWA's implementing regulations also permit the use of Section 4(f) property if the FHWA determines that "the use of the property, including any measure(s) to minimize harm . . . , will have a *de minimis* impact, as defined in [23 C.F.R.] § 774.17, on the property."  23 C.F.R. § 774.3(b).  As previously mentioned, the FHWA concluded that Alternative G1 would have a *de minimis* impact on the Charlottesville and Albemarle County Courthouse Historic District and the McIntire/Covenant School.

has stated that the existence of Section 4(f) "indicates that protection of parkland was to be given paramount importance." *Overton Park*, 401 U.S. at 412–13.

Thus, when confronted with the potential use of Section 4(f) resources, the FHWA must consider alternatives that avoid these resources. These avoidance alternatives become the preferred alternative unless they are shown to be infeasible or imprudent. An alternative is infeasible "if it cannot be built as a matter of sound engineering judgment." 23 C.F.R. § 774.17. An alternative is imprudent if:

> (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;
>
> (ii) It results in unacceptable safety or operational problems;
>
> (iii) After reasonable mitigation, it still causes:
>
> > (A) Severe social, economic, or environmental impacts;
> >
> > (B) Severe disruption to established communities;
> >
> > (C) Severe disproportionate impacts to minority or low income populations; or
> >
> > (D) Severe impacts to environmental resources protected under other Federal statutes;
>
> (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
>
> (v) It causes other unique problems or unusual factors; or
>
> (vi) It involves multiple factors in paragraphs [(i)] through [(v)] of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

*Id.*

If the FHWA has determined that there is no prudent and feasible alternative to using a given Section 4(f) property, the FHWA may approve, from among the remaining alternatives that do use the 4(f) property, only the alternative that causes the least overall harm. 23 C.F.R. § 774.3(c)(1). The least overall harm is determined by balancing the following factors:

> (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

*Id.*

In *Overton Park*, the Supreme Court discussed the review of a Section 4(f) determination by the Secretary of Transportation (or, in this case, the FHWA), stating that under the APA, a reviewing court must "engage in a substantial inquiry." 401 U.S. at 415. The Court identified three factors for the reviewing court to weigh. *Id.* at 415–17. First, the court must determine whether the Secretary acted within the scope of his authority. *Id.* at 415. Under this prong, the court "must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Id.* at 416. Next, the court must ascertain whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law pursuant to the APA. *Id.* Finally, the court must decide "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417. I consider these three factors in turn.

## 1. Feasible and Prudent Alternatives

In *Overton Park*, the Supreme Court stated that Section 4(f) land could not be used "unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds

13

that alternative routes present unique problems."  401 U.S. at 413.  In the case at hand, the crux of Plaintiffs' claim under Section 4(f) is their contention that the FHWA selected Alternative G1 when a feasible and prudent alternative—namely, Avoidance Alternative 2—exists, and that would, if implemented, successfully expand the traffic-moving capacity of the intersection while causing far less dramatic impacts on Section 4(f) properties.  In other words, Plaintiffs argue that Avoidance Alternative 2 does not present unusual factors or unique problems and, as result, should not have been dismissed from further consideration.

In order to uphold an agency's Section 4(f) determination, a reviewing court must, as previously mentioned, first find that the Secretary could have reasonably believed that there were no feasible and prudent alternatives.  Because Plaintiffs' challenge concerns only Avoidance Alternative 2, I will confine my inquiry to whether the FHWA could have reasonably found that particular avoidance alternative to be infeasible and imprudent; I do not analyze the reasonableness of the FHWA's decision to reject other alternatives in depth.  The FHWA concedes that from an engineering perspective, Avoidance Alternative 2, along with all of the alternatives considered, is feasible.

Typically, though, "[t]he more difficult issue is whether the alternatives were prudent." *Hickory Neighborhood Def. League v. Skinner (Hickory I)*, 893 F.2d 58, 61 (4th Cir. 1990).  In this case, after conducting an analysis of the avoidance alternatives, the FHWA determined that Avoidance Alternative 2 would be imprudent.  The FHWA's treatment of Avoidance Alternative 2 in its Final Section 4(f) Evaluation, in its entirety, is as follows:

> Avoidance Alternative 2 would improve the Route 250 Bypass/McIntire Road intersection (proposed under No-Build conditions) to a total of 24 lanes including all four approaches.  The intersection would be shifted to the southwest to avoid impacts to McIntire Park as well as impacts to McIntire Skate Park, Rock Hill Landscape, and the Charlottesville and Albemarle County Courthouse Historic District.  Based on updated traffic projections, this alternative would need to be

expanded to a 29-lane intersection to address future traffic needs at the Route 250 Bypass/McIntire Road intersection and improve vehicular safety.   However, regardless of the number of lanes, the alternative does not meet the project's purpose and need because it would:

> • add more lanes of traffic in each direction, thus making the intersection less safe for pedestrians, bicyclists and motorists due to the increase in crossing distance and the number of conflict points;
>
> • not create a context sensitive setting that would benefit the Park or be in keeping with social demands for a gateway into the Park and downtown Charlottesville; and
>
> • not be consistent with the Congressional earmark in SAFETEA-LU.

Avoidance Alternative 2 is not prudent because it would 1) be unreasonable to proceed with the alternative in light of the project's stated purpose and need; and 2) result in unacceptable safety or operational problems.   Avoidance Alternative 2 is therefore not feasible and prudent and it is being eliminated because it causes other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) properties.

AR 7, Bates #000057.  Thus, the FHWA found that Avoidance Alternative 2 implicates two of the factors for imprudence listed at 23 C.F.R. § 774.17: it would fail to meet the Interchange Project's purpose and need, and it would produce unacceptable safety or operational problems.  I address these grounds in turn.

The FHWA concluded that even if Avoidance Alternative 2 were modified in order to accommodate future traffic demands at the intersection, it would nevertheless fail to meet the purpose and need of the Interchange Project because it would not address safety concerns at the intersection, create a context-sensitive gateway, or respond to Congress's desires as expressed in its earmark for the project.[14]  Because the first of these purpose and need elements is essentially the same as the second ground offered by the FHWA for Avoidance Alternative 2's imprudence—namely, that it would result in unacceptable safety or operational problems—I will consider it in conjunction with my discussion of that ground below.

---

[14] The reasonableness of an agency's objectives is to be afforded "considerable deference."  *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

With respect to its contention that Avoidance Alternative 2 would be inconsistent with Congress's earmark in SAFETEA-LU, the FHWA provides no legislative history to support that assertion. Rather, the FHWA points to the text of the Act. In SAFETEA-LU, there are two outlays—one for $25 million and the other for $2 million—both of which are intended for the construction of the "Meadowcreek Parkway Interchange, Charlottesville." Pub. L. No. 109-59, 119 Stat. 1144, 1449, 1506 (2005). The FHWA stresses the fact that in both instances, Congress elected to use the word "interchange," thus, according to the FHWA, implying that a literal interchange—not simply an at-grade expansion of lanes at the intersection as Avoidance Alternative 2 calls for—is what Congress intended the funds to be put towards. However, I find this reasoning tenuous. First, had Congress intended to foreclose the possibility that the $27 million in total federal funding might be used to construct an expanded, at-grade intersection, it could have easily inserted language to that effect or, alternatively, included conditional language indicating that the funding was being provided for the sole purpose of building a grade-separated interchange. Second, and more importantly, acceptance of the FHWA's argument with respect to Congress's intent necessarily leads to the conclusion that when Congress authorized the allocation of the $27 million in 2005, the construction of an interchange, as opposed to alternative solutions for upgrading the intersection, was a fait accompli. In other words, consideration of non-interchange alternatives would have been nothing more than a sham if the only way to meet Congress's objective and, correspondingly, the only way to meet the project's purpose and need, was to build an interchange.

Separately, the FHWA argues that when Congress is silent or ambiguous with respect to a certain issue, a court must uphold an agency's interpretation of a given provision under the interpretative canon articulated by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  However, *Chevron* does not stand for the unmitigated proposition that any and all agency interpretations must be upheld by a reviewing court; rather, such interpretations are to be upheld *unless* they are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.  In this case, the FHWA's interpretation of SAFETEA-LU as requiring the construction of an interchange constitutes such an arbitrary reading.  Accordingly, I find that the FHWA unreasonably relied on lack of consistency with Congressional intent to support its determination that Avoidance Alternative 2 would be imprudent.

However, as previously mentioned, the FHWA's conclusion that Avoidance Alternative 2 would not meet the project's purpose and need was not based solely on lack of consistency with Congressional intent.  The FHWA also determined that Avoidance Alternative 2 would fail to satisfy the need for a context-sensitive setting that would benefit the Park or be in keeping with social demands for a gateway into the Park and downtown Charlottesville.  Plaintiffs argue that this purpose and need element is, at best, jargon that runs counter to Section 4(f)'s underlying objective of giving the preservation of parkland "paramount importance." *Overton Park*, 401 U.S. at 412–13.  Further, Plaintiffs submit that there is no basis in the administrative record for these purported social demands.  I disagree.  In its Final Section 4(f) Evaluation, the FHWA stated:

> Charlottesville has identified the area surrounding the existing Route 250 Bypass/McIntire Road intersection as a primary gateway to McIntire Park and downtown Charlottesville.  In a conceptual sketch, the 1972 *McIntire Park Master Plan* recognized the opportunity at this location to provide improved access into the park.  The 2004 draft Master Plan for the eastern portion of the park includes an interchange concept for this location that is sensitive to the McIntire Park landscape and facilitates access for pedestrians, bicyclists, and motorized vehicles.  Furthermore, McIntire Road is designated as an 'Entrance Corridor' in the 2005 *Charlottesville Entrance Corridor Design Guidelines* prepared for the City of Charlottesville Planning Commission.  In 2005, the City

of Charlottesville appointed a twelve-member Steering Committee to act in an advisory role to the City and VDOT for this project. The Steering Committee, in advising the Project Team, has recommended that the City "develop a context sensitive, functional and cost-effective design that meets the aesthetic goals of the community while providing a gateway to the City and McIntire Park."

AR 7, Bates # 000041.

Additionally, the Charlottesville City Council supports the Interchange Project and, on December 7, 2009, passed a resolution approving its major design features. *See* AR 402, Bates # 003258–59. While the notion of a context-sensitive gateway might, at first blush, strike one as vague, there is, in fact, a clear basis in the administrative record for this concept. And neither the FHWA nor the Charlottesville City Council found that Avoidance Alternative 2 could meet this component of the purpose and need. It is not the province of this Court to second-guess the validity of that decision; rather, the task before me is to decide whether the FHWA could have reasonably believed that Avoidance Alternative 2 would be imprudent, based on its inability to meet this aspect of the Project's purpose and need. Ultimately, I conclude that the FHWA's determination in this regard was reasonable.

As stated in the previously quoted portion of the FHWA's Final Section 4(f) Evaluation, the safety of pedestrians, bicyclists, and motorists was identified as a prominent concern with regard to the prudence of Avoidance Alternative 2. The FHWA determined that even if the intersection were expanded only to the twenty-four lanes that Avoidance Alternative 2 calls for, rather than the twenty-nine lanes that would be necessary to meet future traffic demands, such an expansion would result in decreased safety, especially for pedestrians and bicyclists endeavoring to cross the Route 250 Bypass. Alternative G1 ameliorates these risks, for those pedestrians and bicyclists would be able to pass underneath the bypass. The FHWA maintains that these risks to public safety are not only imprudent consequences to Avoidance Alternative 2 in and of

themselves, but they also represent an obstacle to achievement of the Interchange Project's purpose and need.

Plaintiffs offer two points in rebuttal. First, they assert that a well-timed traffic light and crossing signals could address the FHWA's concern regarding the safety of non-motorized traffic and pedestrians. While Plaintiffs may be correct that there is a way to engineer an expanded intersection that also adequately ensures the safety of those individuals crossing the Route 250 Bypass, I reiterate that the Court's role in this case is not to serve as an arbitrator, deciding whose reasonable argument is superior to the other's. Rather, I am, in the first instance, simply charged with determining the reasonableness of the FHWA's conclusion that there was no feasible and prudent alternative to the use of Section 4(f) property. With respect to the FHWA's safety concerns, I find that this decision was reasonable, for it is clear that an expanded intersection, as opposed to an interchange, could very well present safety risks of a greater magnitude to non-motorized passers through.

In this vein, Plaintiffs' second point of contention is that because there is no guarantee that the MRE will be built—either down to the present intersection or to the proposed 775-foot spur northward into the Park—no reason exists to believe that an appreciable volume of pedestrians and non-motorized traffic will be traveling across (or underneath) the Route 250 Bypass and into the Park. However, the administrative record indicates otherwise. Not only does the Interchange Project assume the construction of the MRE (as does the no-build alternative), but it also proposes the construction of bike lanes and shared-use trails that extend into the Park, regardless of whether or not the MRE is built. *See* AR 7, Bates # 000037. Ultimately, the FHWA's determination that safety concerns make Avoidance Alternative 2 an imprudent alternative was undoubtedly reasonable. *See Hickory Neighborhood Def. League v.*

*Skinner (Hickory II)*, 910 F.2d 159, 164 (4th Cir. 1990) ("[A]lternatives [that] would not fulfill

the transportation needs of the project" are "properly rejected . . . as imprudent.").

Overall, despite its misplaced reliance on Congressional intent, the FHWA's

determination that Avoidance Alternative 2 was not a feasible and prudent alternative to the use

of Section 4(f) property was reasonable in light of that plan's inability to meet the Interchange

Project's purpose and need, and its failure to adequately ensure the safety of non-motorized

traffic and pedestrians passing through the intersection.  *See* 23 C.F.R. § 774.17; *City of*

*Bridgeton v. FAA*, 212 F.3d 448, 461 (8th Cir. 2000) ("[A]n alternative that does not effectuate

the project's purposes is, by definition, unreasonable, and need not be evaluated in detail under

§ 4(f).") (citation and internal quotations marks omitted).[15]

## 2. Arbitrary and Capricious Decisionmaking

The inquiry, however, does not end there, for I must examine whether the FHWA's

decision with respect to Avoidance Alternative 2 was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "To make this

finding the court must consider whether the decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.

In so doing, I must not substitute my own judgment for that of the FHWA.  *See id.*

As I have previously recited, an action is arbitrary and capricious under the APA if the

agency

---

[15] I note that in its Final Section 4(f) Evaluation, the FHWA explicitly found that Avoidance Alternative 2, as originally proposed, would not have a sufficient number of lanes to accommodate projected traffic volume at the intersection of the Route 250 Bypass and McIntire Road.  Because the FHWA determined that Avoidance Alternative 2 would still be imprudent even if it were expanded to the twenty-nine lanes necessary to accommodate such future traffic, and in light of the fact that the parties base their arguments on the twenty-nine-lane version of the plan, I will not decide whether the inability of Avoidance Alternative 2, as originally proposed, to accommodate *projected* traffic volume could, by itself, make that alternative imprudent.  *See Hickory Neighborhood Def. League v. Skinner (Hickory II)*, 910 F.2d 159, 164 (4th Cir. 1990) ("Alternatives which will not solve or reduce *existing* traffic problems may properly be rejected . . . as not prudent.") (emphasis added).

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In the instant matter, Plaintiffs have not suggested that the FHWA relied on impermissible factors in its consideration of avoidance alternatives, or that the FHWA failed to consider an important aspect of the problem.  Rather, at bottom, Plaintiffs take issue with the FHWA's determination that Avoidance Alternative 2 was imprudent, and accordingly characterize that conclusion as arbitrary and capricious decision-making.  However, as I have described, the FHWA's determination with respect to the prudence of the avoidance alternatives, including Avoidance Alternative 2, was reasonable.

Ultimately, Plaintiffs' contention that the FHWA acted arbitrarily and capriciously is inadequately substantiated, and simply amounts to the sort of "difference in view" that the Supreme Court stated was insufficient to support a finding of arbitrariness and capriciousness under the APA.  *Id.*  Further, although it may not be overwhelming, there is sufficient evidence in the administrative record to support the FHWA's findings that the avoidance alternatives were imprudent.  Consequently, I find that the FHWA's Section 4(f) determinations were not arbitrary or capricious.

3. Procedural Requirements

The final step in an analysis of a Section 4(f) determination requires the reviewing court to consider whether the Secretary of Transportation (or, in this case, the FHWA) followed the necessary procedural steps.  In the instant matter, there is no doubt that these procedures were followed.  The FHWA undertook studies, analyzed the results, and, ultimately, produced a Final Section 4(f) Evaluation only after providing the public with opportunities for review and

comment, and giving officials with jurisdiction over the Section 4(f) properties a chance for coordination and commentary pursuant to 23 C.F.R. § 774.5(a).  In the course of preparing the Final Section 4(f) Evaluation, the FHWA followed the regulatory requirements of considering avoidance alternatives (including a no-build alternative) and testing them for feasibility and prudence pursuant to 23 C.F.R. § 774.3(a)(1).  After concluding that there were no feasible and prudent total avoidance alternatives, the FHWA, in accordance with 23 C.F.R. § 774.3(c), analyzed the remaining alternatives that use Section 4(f) properties to determine which would cause the least overall harm in light of Section 4(f)'s preservation goals.  Upon its selection of Alternative G1 as the preferred alternative, the FHWA developed and included all possible planning to minimize harm to the affected Section 4(f) properties as required by 23 C.F.R. § 774.3(c)(2).  Thus, the FHWA properly followed the required procedures.

After a thorough review of the relevant portions of the administrative record, and in light of the foregoing discussion, I find that: (1) the FHWA acted within the scope of its authority and acted reasonably when it determined that there were no feasible and prudent alternatives to the use of Section 4(f) property; (2) the FHWA's decision was not arbitrary, capricious, an abuse of discretion, or otherwise in discordance with the law; and (3) the FHWA followed proper procedures.  For these reasons, I find that the FHWA did not violate Section 4(f) by rejecting Avoidance Alternative 2, or, for that matter, any of the other alternatives it carefully considered. Further, I observe that simply because the FHWA did not, when discussing Avoidance Alternative 2, consistently use the terms "unique" and "extraordinary" to describe that alternative's drawbacks "does not compel a finding that [it] did not comply with section 4(f) and the dictates of *Overton Park*."  *Hickory II*, 910 F.2d at 162; *see also Adler v. Lewis*, 675 F.2d 1085, 1095 (9th Cir. 1982) (stating that the use of "magic" terminology is not required in a

Section 4(f) analysis).  As in *Hickory II*, "the record amply supports the conclusion that the [FHWA] did determine that there were compelling reasons for rejecting the proposed alternatives as not prudent."  *Id.* at 163.  Accordingly, I will not disturb the FHWA's Section 4(f) decision to proceed with Alternative G1.

### B. NEPA Claims

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, stands as the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  As such, it declares a national policy in favor of the protection and promotion of environmental quality.  *See Hughes River Watershed Conservancy v. Glickman (Hughes River I)*, 81 F.3d 437, 443 (4th Cir. 1996) (citing 42 U.S.C. §§ 4321, 4331(a)); *see also* 40 C.F.R. § 1500.1(c) (stating that the purpose of NEPA is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment").

However, NEPA is fundamentally procedural in nature; "although NEPA establishes environmental quality as a substantive goal, it is well settled that NEPA does not mandate that agencies reach particular substantive results."  *Hughes River I*, 81 F.3d at 443.  The goals of NEPA "are thus realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation and internal quotation marks omitted).  So long as "the adverse environmental effects of . . . proposed actions are adequately identified and evaluated, agencies are not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Hughes River I*, 81 F.3d at 443 (citation, internal quotation marks, and alterations omitted).

An agency takes a "hard look" when it "obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River Watershed Conservancy v. Johnson (Hughes River II)*, 165 F.3d 283, 288 (4th Cir. 1999). Agency action need not, however, be perfect. *See Sierra Club v. Morton*, 510 F.2d 813, 820 (5th Cir. 1975) ("Congress did not intend to mandate perfection" when it created NEPA.). If the reviewing court is satisfied that the agency has taken the requisite "hard look," the court must then consider whether the agency's conclusions are arbitrary and capricious under the APA. *Hughes River II*, 165 F.3d at 288. "If the agency has followed the proper procedures mandated by the Act, and if there is a rational basis for its decision, the [reviewing court] will not disturb the agency's judgment." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 661 (D. Md. 2007).

Generally, NEPA requires every agency proposing a "major Federal action" to prepare an environmental impact statement ("EIS") if the action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(C).[16] Based on regulations promulgated by the Council on Environmental Quality ("CEQ"), agencies must establish procedures identifying "[s]pecific criteria for and identification of those typical classes of action" that require or do not require an EIS. 40 C.F.R. § 1507.3(b)(2). In considering any particular proposed action, an agency must first determine whether, under its own regulations, the proposal would "[n]ormally require[ ] an [EIS]" or "[n]ormally [would] not require either an [EIS] or an environmental

---

[16] "Even where an [environmental assessment] determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the level of significance." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191–92 (4th Cir. 2009) (citing *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62 (4th Cir. 1991)).

assessment . . . ."  *Id.* §§ 1501.4(a)(1), (2).[17]  If the proposed action is not covered by either of these descriptions, the agency must prepare an environmental assessment ("EA").  *Id.* § 1501.4(b).  Based on its analysis in the EA, the agency then must decide whether to prepare an EIS.  *Id.* § 1501.4(c).  If the agency determines that an EIS is not necessary, it must issue a finding of no significant impact ("FONSI").  *Id.* §§ 1501.4(e), 1508.13.

> An EA is a "concise public document" which serves to:
>
> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
> (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
> (3) Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a).  While there is no "universal formula for what an EA must contain and consider," *Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F. Supp. 2d 1054, 1062 (D.S.C. 2011), an EA must, at a minimum, include discussion of the need for the proposal, alternatives, the environmental impacts of the proposed action and the alternatives, and the agencies and persons consulted, 40 C.F.R. § 1508.9(b).  An agency must make a "convincing case" as to why an EIS is not necessary if it so decides after preparation of an EA.  *Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 (D.C. Cir. 1973).  In any event, whether issuing an EA or an EIS, the agency's "hard look" must encompass "a thorough investigation into the environmental impacts of [the] agency's action and a candid acknowledgment of the risks that those impacts entail."  *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005).

---

[17] Under the FHWA's regulations, an interchange is not on the list of actions that normally have a significant impact on the environment (and thereby automatically require the preparation of an EIS). 23 C.F.R. § 771.115(a).

1. <u>The FHWA's Decision Not to Prepare an Environmental Impact Statement</u>

Plaintiffs argue that the FHWA violated NEPA by failing to prepare an EIS.  As mentioned, an EIS is required when actions proposed by a federal agency, including the FHWA, could significantly affect the quality of the human environment.  42 U.S.C. § 4332(C); 23 C.F.R. § 771.115(a).[18]  Whether a proposed action will have a "significant" effect on the quality of the human environment "is determined by evaluating both the context of the action and the intensity, or severity, of the impact."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (citing 40 C.F.R. § 1508.27).  As used in NEPA, the "context" requirement

> means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.  Both short- and long-term effects are relevant.

40 C.F.R. § 1508.27(a).  When evaluating a proposed action's "intensity," an agency should take into account the following ten considerations:

> (1) Impacts that may be both beneficial and adverse.  A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
>
> (2) The degree to which the proposed action affects public health or safety.
>
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

---

[18] NEPA's EIS requirement serves two purposes:

> First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).  If the agency's action is "environmentally 'significant' according to *any* of these criteria," the agency "erred in failing to prepare an EIS." *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1023 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004).

### i. Intensity of the Interchange Project's Environmental Impacts

Plaintiffs maintain that the third, fourth, and seventh of these intensity criteria were satisfied in this case, and thus contend that an EIS should have been prepared.  I address these criteria one after another.

Plaintiffs' brief in support of their motion for summary judgment contains a passing reference to the third criterion above, which instructs a given agency to consider the "unique characteristics" of nearby historic sites and parkland in connection with its proposed action. Plainly, in the instant matter, such lands are the very same properties considered by the FHWA in its Section 4(f) analysis and discussed previously in this memorandum opinion.  Plaintiffs do

not, however, explain what the unique aspects of those properties are, nor do they suggest that the impacts of the Interchange Project on these five areas would be severe. As I outlined in Part III.A, *supra*, the effects on the Charlottesville and Albemarle County Courthouse Historic District and the McIntire/Covenant School were found to be *de minimis*. Further, the Interchange Project under the preferred alternative would require the use of some (1.1 acres), but not all, of the Rock Hill Property, and some (7.8 acres), though not all, of McIntire Park. Indeed, only McIntire Skate Park would be totally displaced. And while I do not discount the value to the community of the facilities that currently exist at the skate park, it cannot be the case that they are "unique" as contemplated in 40 C.F.R. § 1508.27(b)(3) in light of the fact that, prior to construction of the Interchange Project, they will be packed up and transported to a different facility in the area where members of the community will be able to resume using them. All that Plaintiffs offer with regard to this criterion is their contention that the damaging effects to the aforementioned properties, when cumulated, become substantial. Because that argument is better addressed in my examination of the seventh criterion from above, I will defer discussion of it.

With respect to the fourth factor, Plaintiffs assert that the Interchange Project, along with its prior iterations and predecessor proposals, has dominated local news, public discourse, and political affairs for decades.[19] Accordingly, they argue that the FHWA failed to adequately account for "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). I have no doubt that the Interchange Project and, indeed, the more fundamental issue of what to do, if anything, with the intersection

---

[19] As of the filing of their brief in support of their motion for summary judgment, Plaintiffs represent that proponents of the Interchange Project enjoyed only a one-vote margin on the Charlottesville City Council.

of the Route 250 Bypass and McIntire Road is politically controversial, in the ordinary sense of that word.   However, mere opposition to a given project, even when that opposition is vociferous, does not render the project "controversial" within the meaning of the regulations promulgated by the CEQ.   Instead, as the United States Court of Appeals for the Fourth Circuit has observed, the term "highly controversial"

> should properly refer to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use.   Otherwise, to require an impact statement whenever a threshold determination dispensing with one is likely to face a court challenge would surrender the determination to opponents of a federal action, no matter whether major or not, nor how insignificant its environmental effect might be.

*Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973).   Indeed, were controversy in the context of NEPA to be equated with opposition in the community, the outcome of an agency's environmental analysis could routinely be held hostage by any "heckler's veto."   *North Carolina v. FAA*, 957 F.2d 1125, 1134 (4th Cir. 1992) (citation omitted).   According to the FHWA, there has been no opposition whatsoever from any state or federal environmental resource agency, or any official with standing to object.   *See* AR 6, Bates # 000029.[20]   In the instant matter, the degree to which the effects on the quality of the human environment would be controversial were the Interchange Project to be completed is not significant enough to require the preparation of an EIS.

The seventh factor listed in 40 C.F.R. § 1508.27(b) lies at the heart of Plaintiffs' contention that the FHWA was required to prepare an EIS.   Plaintiffs submit that the Interchange Project and the MRE are functionally and environmentally intertwined; therefore, the FHWA

---

[20] The FHWA also points out that the Interchange Project is not the same project that certain federal agencies commented on in the mid-1990s.

violated NEPA by failing to adequately consider their joint and cumulative environmental impacts in determining whether an EIS was necessary.

NEPA requires an agency conducting an assessment of a proposed action's environmental impacts to measure the indirect and cumulative effects of that action. See 40 C.F.R. § 1502.16. "Conclusory statements that the indirect and cumulative effects will be minimal or that such effects are inevitable are insufficient under NEPA." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, --- F.3d ---, No. 11-2210, 2012 WL 1548685, at *5 (4th Cir. May 3, 2012). For the purposes of NEPA, a cumulative impact is defined as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Plainly, it is not sufficient for an agency, when evaluating the impacts of a proposed action on the environment, to gauge the effects of that action in isolation. Rather, the agency must examine the aggregate impacts of the proposed action and any other actions—past, present, or future—regardless of their source of funding. It is obvious that the MRE fits this bill, for if its construction comes to fruition, its adjacency to the Interchange Project will assuredly, in some respects, produce cumulative impacts on the environment. Therefore, I must assess whether, in the course of determining that the preferred alternative would not significantly impact the environment, the FHWA properly weighed the intensity of the cumulative effects of the Interchange Project and the MRE. *See Shenandoah Ecosystems Def. Group v. U.S. Forest Serv.*, No. 98-2552, 1999 WL 760226, at *4 n.2 (4th Cir. Sept. 24, 1999) (stating that whether a particular agency properly considered the cumulative impacts of a project is, for the reviewing court, a "case-by-case analysis").

On October 6, 2009, the FHWA released its Revised EA, in which it summarizes, among other things, its analyses of the Interchange Project's environmental consequences.  The Revised EA, which distills information and data from other technical documents and reports that were prepared during 2006 and 2007, examines the effects of the preferred alternative on the following: land use and socioeconomics, right-of-way and relocation, cultural resources, Section 4(f) resources, air quality, noise levels, water quality, hazardous materials, agriculture, ecology, aesthetics, and pedestrian and bicycle considerations.  AR 534, Bates # 004701–30.  After discussing these impacts, the Revised EA proceeds to an evaluation of the preferred alternative's indirect and cumulative effects.  *Id.* at Bates # 004730–37.  The FHWA extended the boundary for this analysis of indirect and cumulative impacts approximately one mile in each direction from the existing intersection of the Route 250 Bypass and McIntire Road.  *Id.* at Bates # 004730.  At the outset of the discussion, the FHWA identifies the MRE (and, it should be noted, the Meadowcreek Parkway) as an upcoming transportation priority project that falls within the analysis boundary and, accordingly, must be included in the assessment of cumulative effects. *Id.* at Bates #004732.

In the cumulative effects section, the FHWA frankly acknowledges that Alternative G1 and the MRE would have cumulative impacts on McIntire Park.  Specifically, the FHWA states:

> McIntire Road Extended would introduce additional features into the park. Therefore, the context of the cumulative impacts is one whereby past, present, and reasonably foreseeable future actions have affected, and are planned to continue to affect, McIntire Park independent of the interchange project.  The Preferred Alternative would contribute to the incremental impact on the park. . . . McIntire Golf Course would be affected as a result of the cumulative effects of the interchange project and McIntire Road Extended.

*Id.* at Bates # 004734.[21]

With respect to habitats and wildlife in the area, the Revised EA concludes that the preferred alternative, when combined with unspecified transportation projects, would have cumulative effects on approximately six acres, thereby impacting certain non-endangered species. *Id.* at Bates # 004736. However, the "incremental impact of the Preferred Alternative would be consistent with the regional pattern of land use change from forest and other wildlife habitat to developed uses that has occurred historically." *Id.*

On the whole, with respect to the cumulative effects on the environment of Alternative G1 and the MRE, the Revised EA concludes:

> These two roadway projects would have an additive cumulative effect that would include conversion of park recreational land to transportation uses, increased traffic and noise through the park, and impacts to habitat and wildlife in the park. However, the parkway [sic] and interchange projects would also have a substantial beneficial effect by facilitating pedestrian and bicycle access and creating a new entrance to the currently underutilized eastern part of the McIntire Park, as intended by those responsible for managing the park and its resources. . . . [T]he City of Charlottesville has demonstrated its intent to develop the eastern portion of McIntire Park while accommodating McIntire Road Extended and an interchange at McIntire Road with the Route 250 Bypass. This development will be a multi-phased program designed to enhance current amenities and provide opportunities for more intensive use of the Park's features while accommodating the roadway improvements.

*Id.*

The Revised EA is not, however, the only instance in which the cumulative effects of the preferred alternative and the MRE are discussed. For example, these cumulative impacts are reviewed in VDOT's letter finalizing the environmental assessment process and requesting the FHWA's issuance of a FONSI in light of the conclusion, noted by the City of Charlottesville and

---

[21] The Revised EA observes that the "loss of parkland from McIntire Road Extended has already been replaced by 49 acres of parkland in Albemarle County." AR 534, Bates # 004736. Evidently, Albemarle County deeded this land to the City of Charlottesville. *See* AR 36, Bates # 000415.

VDOT, that "while the project would have some adverse effects, the project would not have a significant impact on the environment."  AR 36, Bates # 000407.   In the letter, VDOT acknowledges that the preferred alternative and the MRE would cause incremental and cumulative impacts on the Park.  *Id.* at Bates # 000415–16.  However, the letter states that "a cumulatively *significant* impact is not anticipated."  *Id.* at Bates # 000416 (emphasis added).

Finally, in the FONSI it issued on September 29, 2010, the FHWA independently evaluated the conclusion reached by the City of Charlottesville and VDOT that construction of the preferred alternative would not have a significant impact on the environment.  AR 6, Bates # 000017.  To do so, the FHWA reanalyzed the context and intensity of the Interchange Project's environmental impacts.  Part of the FHWA's discussion of the cumulative effects focused on the impacts to the Park:

> The McIntire Road Extended project is a reasonably foreseeable project in the same area as the interchange project.  Even though the McIntire Road Extended project is not being funded by FHWA or under its jurisdiction, it was included in the cumulative effects analysis for McIntire Park because the project is reasonably foreseeable and it would affect the park.  The McIntire Road Extended project would impact McIntire Park with approximately 2.6 acres of permanent roadway and 9.4 acres of temporary construction easements.  Although the interchange project and the McIntire Road Extended projects would have some adverse effects on McIntire Park, the projects also would have beneficial effects.

*Id.* at Bates # 000026.  After describing these beneficial effects, and after noting the fact that additional mitigation and harm-minimization measures have been and will be taken, the FONSI concludes that "the cumulative effects on McIntire Park are not significant."  *Id.*  Thereafter, the FONSI considers each of the factors for intensity promulgated by the CEQ, finding that none of them—including the seventh criterion—rise to the level of severity that would be necessary to require preparation of an EIS.  *Id.* at Bates # 000028–30.

Based on the discussions contained within the Revised EA, the letter finalizing the environmental assessment process and requesting the issuance of a FONSI, and the FONSI that

the FHWA ultimately issued, I find that the requisite consideration of the Interchange Project's cumulative impacts on the environment was adequately undertaken.  In the end, the FHWA determined that these cumulative effects lacked the degree of intensity necessary to elevate them to the critical status of "significant" environmental impacts.  As a result, the FHWA concluded that preparation of an EIS was unnecessary and that a FONSI would suffice.  In reaching this conclusion, the FHWA acted neither arbitrarily nor capriciously.  To the contrary, I find that the FHWA's evaluation of the Interchange Project's cumulative effects was well-reasoned and sufficiently thorough to merit being upheld.  *See Hughes River II*, 165 F.3d at 288 ("As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs.") (citations omitted).

## ii. Segmentation Analysis

In the course of arguing that an EIS should have been prepared, Plaintiffs raise an argument related to, yet distinct from, their foregoing contention regarding cumulative impacts. Essentially, they assert that when it was deciding whether to prepare an EIS, the FHWA should have considered the Interchange Project and the MRE together, as one project, and that the FHWA's failure to do so amounts to deliberate (and improper) "segmentation" of a larger project.  "In determining whether a project has a significant environmental impact, an agency may not avoid significant environmental impact by improperly 'segmenting' a project by dividing the NEPA analysis of a larger action with significant impacts into smaller actions with insignificant impacts."  *Wilds v. S.C. Dep't of Transp.*, 9 F. App'x 114, 120 (4th Cir. 2001); *see also Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1140 (5th Cir. 1992) (describing segmentation as "an attempt by an agency to divide artificially a 'major Federal

action' into smaller components to escape the application of NEPA to some of its segments"). "The purpose of segmentation review is not for a court to decide whether or not an agency drew the correct lines when putting the boundaries on its projects," *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003); rather, "[s]egmentation analysis functions to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist.  When the segmentation project has *no* independent jurisdiction, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid." *Barton Creek*, 950 F.2d at 1139 (citation and internal quotation marks omitted).

A court inquiring into the potentially improper segmentation of a project must consult the FHWA's regulations, which provide that the action evaluated in an EIS or FONSI shall:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
>
> (2) Have independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
>
> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f).  While the regulations do not prescribe how these factors should be weighted, "[i]n the context of a highway within a single metropolitan area, as the case at issue— as opposed to projects joining cities—courts have focused more on the factor of 'independent utility.'" *Barton Creek*, 950 F.2d at 1140; *see also Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (observing the fact that courts generally focus more heavily on the independent utility factor); *Ass'n Concerned About Tomorrow, Inc. v. Dole*, 610 F. Supp. 1101, 1108 (N.D. Tex. 1985) ("[T]he illogic of a terminus is at best a secondary inquiry, shadowed by the independent utility inquiry.") (citation omitted).  Bearing in mind this emphasis on the importance of the independent utility inquiry, I proceed to an analysis of the three factors.

As defined in the FHWA's 1993 instructional paper entitled "NEPA and Transportation Decisionmaking: The Development of Logical Project Termini," logical termini are defined as: "(1) rational end points for a transportation improvement, and (2) rational end points for a review of the environmental impacts. . . . In the past, the most common termini have been points of major traffic generation . . . ."  AR 1986, Bates # 017116.  Because, as I have previously described, the FHWA properly took into account the cumulative impacts of the Interchange Project and the MRE, the second of the two aforementioned definitions is irrelevant to the present inquiry.  Instead, it is the first definition of logical terminus—a rational end point for a transportation improvement—with which Plaintiffs' assertion of illogic is concerned.

Plaintiffs contend that the Interchange Project, if built as proposed in Alternative G1, would not connect logical termini.  They point to the fact that under most renditions of Alternative G1, the Interchange Project calls for an extension of McIntire Road, carrying it 775 feet north of its current intersection with the Route 250 Bypass.  *See, e.g.*, AR 36, Bates # 000405.  Although the clear implication is that McIntire Road would join with the MRE at this point, Plaintiffs maintain that because the MRE has not been built (and might not ever be completed), it is more appropriate to describe this northern extension of McIntire Road as terminating in the middle of McIntire Park without connecting to any *existing* roadway, crossroad, or traffic generator.  *See Indian Alliance v. Volpe*, 484 F.2d 11, 18 (8th Cir. 1973) (describing logical termini).  In other words, Plaintiffs describe the northern spur of McIntire Road that has been incorporated into the preferred alternative as a veritable "road to nowhere."  I agree that, in the event the MRE is never constructed and the design proposed by Alternative G1 is not amended accordingly, there would be no need for the 775-foot protrusion into the Park because such a highway "stub," as Plaintiffs describe it, would, quite literally, end in the middle

of the woods.  Indeed, it is worth observing that the same conclusion can be drawn about the MRE in the event the Interchange Project does not, for whatever reason, proceed to fruition; an MRE that terminated 775 feet north of McIntire Road would similarly end in the middle of the Park.

To state that a road terminating in the middle of the woods, and thus incapable of delivering traffic to nearby roadways, would be an illogical project development is an understatement.  However, if the MRE is, in fact, built down from Melbourne Road to a point 775 feet north of the present intersection, it would be completely logical for the Interchange Project to extend McIntire Road so that the two facilities could meet and achieve their respective goals.  Indeed, Alternative G1 proposes to accomplish precisely that end.  The FHWA has not, however, irrevocably committed the Interchange Project to the construction of 775 additional feet of McIntire Road.  Rather, the preferred alternative's tentative proposal to extend McIntire Road northward is based on VDOT's advertisement for construction bids for the MRE in December 2009.  *See, e.g.*, AR 36, Bates # 000404.  For reasons unspecified by the parties, VDOT's advertisement had the MRE beginning approximately 775 feet north of the Route 250 Bypass, notwithstanding the fact that in both the Charlottesville-Albemarle Metropolitan Planning Organization's fiscally Constrained Long-Range Transportation Plan ("CLRP") and the FHWA's no-build alternative, the MRE's southern terminus is actually at the Route 250 Bypass. *Id.*  While it is true that the FHWA's Revised EA predates VDOT's advertisement for bids, the inconsistency with respect to the southern terminus of the MRE was addressed in both the letter requesting the issuance of a FONSI and the FONSI itself.  *See id.* at Bates # 000408; AR 6, Bates # 000031–32.  In these documents, certain determinations and calculations were updated to

reflect the fact that the Interchange Project, as opposed to the MRE, would likely be responsible for the 775 feet of McIntire Road north of the intersection because of VDOT's advertisement.

Moreover, in the FONSI, the FHWA acknowledges that, pursuant to 23 C.F.R. § 771.129(c), it will have to conduct a reevaluation prior to granting certain requisite approvals (for example, the authority to use federal funds to acquire rights-of-way and the authority to use federal funds for construction).  AR 6, Bates # 000031.  "At the time of each reevaluation," the FHWA states, it will "reassess the status of the McIntire Road Extended project . . . , *especially with regard to the northern extension*."  *Id.* (emphasis added).  Thus, even if the limits of the MRE have been set by VDOT, and even though location alternatives for the MRE are no longer under consideration, the FHWA has represented that it will nonetheless reassess the status of the northern extension into the Park in order to account for any unanticipated changes in the location of the MRE's southern terminus.  *Id.* at Bates # 000032.

Ultimately, in addressing the logic of the Interchange Project's termini, Plaintiffs' focus is misplaced.  The question is not whether it is rational or logical for the Interchange Project and the MRE to meet 775 feet north of the Route 250 Bypass instead of at the current intersection, but instead whether, for the purposes of both improving transportation and assessing environmental impacts, it is logical for the Interchange Project to extend north to meet the MRE at the point where its construction by VDOT is proposed to begin.  Undoubtedly, the latter question can be answer affirmatively.  In fact, if the present design for Alternative G1 did *not* call for the northern extension of McIntire Road up to the MRE, the FHWA would have failed to connect logical termini.  Because I find that the Interchange Project connects logical termini, I must address the more significant factor from above: independent utility.  *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1183 (10th Cir. 2002) ("An inquiry into

independent utility reveals whether the project is indeed a separate project, justifying the consideration of the environmental effects of that project alone.").

Before the regulations at 23 C.F.R. § 771.111(f) were codified, a district court explored the notion of independent utility in the context of project segmentation in the seminal case of *James River v. Richmond Metropolitan Authority*, 359 F. Supp. 611 (E.D. Va. 1973).   In *James River*, a case upon which Plaintiffs rely, the suing parties argued that there was sufficient federal involvement to require the preparation of an EIS for the Downtown Expressway in Richmond, Virginia, despite the fact that no federal funding was being allocated for that particular segment. *Id.* at 632.   In so arguing, the plaintiffs asserted that "the entire Richmond Expressway system is an integrated, interdependent system and that the federal involvement in the original planning of the whole system and in one major highway is sufficient to make the entire system federal in nature." *Id.*   The court dubbed the plaintiffs' theory, today known as segmentation, as "project splitting," and stated that "state and federal highway authorities may not avoid the requirements of federal law by splitting what is in essence a single, federal project into several segments and funding certain of those segments with state funds only." *Id.* at 634.   The court agreed with the plaintiffs' contention that the planners of the Richmond Expressway system perceived the highways comprising that system as unified and interdependent; however, the court observed that this conclusion did not necessarily mean that the roads constituted a single project, for "not every state road whose construction has the effect of increasing the efficient use of a proposed federal road, thus making the construction of that federal road more likely, becomes federal in nature." *Id.* at 635.   In order to determine when a group of segments should be classified as a single project for purposes of NEPA, the court included as one of the requisite factors an inquiry into the "utility of each in the absence of the other." *Id.*

39

In assessing the independent utility of the Interchange Project and the MRE, I note that I, like the district court in *James River*, do not "sit as a traffic expert to determine when one will be efficient if the other is not built." *Id.*  But if I conclude that the two projects "each have such little value in their own right that their separate construction could be considered arbitrary or irrational," I will find them to be a single project for the purposes of NEPA.  *Id.*; *see also Dole*, 826 F.2d at 69 (stating that in assessing independent utility, "[t]he proper question is whether one project will serve a significant purpose even if a second related project is not built.").

In the FONSI it issued, the FHWA actually discusses the independent utility of the Interchange Project in light of citizens' concerns.  AR 6, Bates # 000031–32.  The FHWA concluded that even if no additional transportation improvements were made in the area, including construction of the MRE, the Interchange Project would still have utility and be a reasonable expenditure of funds.  *Id.* at Bates # 000032.  According to the FHWA, even if the MRE is not built, the preferred alternative would still ameliorate traffic deficiencies, improve LOS at the existing intersection, and enhance mobility for bicyclists and pedestrians.  *Id.* Significantly, the FHWA also determined that, even if the Interchange Project was ultimately built without the northern spur into the Park, the aforementioned needs and purposes would still be served by the construction of a diamond-shaped interchange at the existing intersection.  *Id.*

The FHWA's stance regarding the independent utility of the Interchange Project is reasonable.  Even if the MRE is not constructed, the preferred alternative would nevertheless produce significant improvements.  For example, under Alternative G1, access to Birdwood Road and Hillcrest Road and the residences located there would be enhanced, thus improving vehicular traffic safety.  Additionally, the introduction of designated bicycle lanes on McIntire Road would improve mobility in that respect, and the fact that the Route 250 Bypass would pass

40

over McIntire Road means that these bicyclists would be able to more safely access the Park. Furthermore, the preferred alternative calls for the creation of several shared-use paths that would enable both bicyclists and pedestrians to access, for example, the Park and the Dogwood Vietnam Memorial in ways that, to date, they cannot.  The preferred alternative also would provide greater mobility for emergency responders by relocating the entrance to the Charlottesville Albemarle Rescue Squad.  *See, e.g.*, AR 37, Bates # 000636.  And of course, under Alternative G1, the FHWA's studies indicate that LOS and safety at the existing intersection would be improved as the addition of entrance and exit ramps to the Route 250 Bypass would ease entry to and egress from McIntire Road.  *See Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 567 (W.D. Tex. 2011) ("[T]he FHWA rationally determined the interchange improvements will have substantial independent utility, regardless of whether other projects are undertaken in the [area], because the improvements are designed to ameliorate the serious safety and congestion problems in the project area.").

Separately, Plaintiffs argue that these two projects lack independent utility because they would connect and feed traffic to one another.  But by relying on the mere fact that the projects "overlap," Plaintiffs miss the mark.  After all, "it is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility."  *Dole*, 826 F.2d at 69; *see also Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1483–84 (10th Cir. 1990) ("Because all local projects must start and end somewhere, under plaintiffs' theory the entire highway network across the country could be considered one project.  Such an implication is obviously indefensible.").  The relevant inquiry, as mentioned, is instead whether a given project will serve a significant function even if the related project is not constructed.  Ultimately,

41

I am convinced that the Interchange Project serves rational needs in its own right, apart from feeding traffic to the proposed MRE.  *See James River*, 359 F. Supp. at 636.  Therefore, it possesses the requisite independent utility.

The final factor that I must consider in assessing whether the FHWA engaged in improper segmentation is whether construction of the Interchange Project would "restrict consideration of alternatives for other reasonably foreseeable transportation improvements . . . ." 23 C.F.R. § 771.111(f)(3).  Plaintiffs do not seem to contest this last element of the segmentation inquiry; however, I will briefly examine it.  In the FONSI, the FHWA states that the only other reasonably foreseeable transportation improvement in the immediate vicinity of the Interchange Project is the MRE.  AR 6, Bates # 000032.  According to the FHWA, construction of the Interchange Project could not restrict consideration of alternatives for the MRE because VDOT began advertising for construction bids in December 2009.  *Id.* at Bates # 000031–32.  In other words, the limits of the MRE are essentially set, and location alternatives for it are, as a result, no longer under consideration.  *Id.* at Bates # 000032.  I concur with the FHWA's reasoning in this regard.  Accordingly, I find that the Interchange Project would not restrict consideration of alternatives for other reasonably foreseeable transportation improvements in the area.

After analyzing the three segmentation factors codified at 23 C.F.R. § 771.111(f), I conclude that the FHWA did not engage in improper segmentation of a larger project, and that it was not necessary for the FHWA to treat the Interchange Project and the MRE as a single project for the purposes of its environmental analyses under NEPA.  The aptness of this conclusion is buttressed by my review of the administrative record, which reveals no attempts by the FHWA to divide an otherwise comprehensive roadway improvement plan for the area in and around the Park into segments as a means of avoiding the mandates of federal law.  *See James River*, 359 F.

Supp. at 635 ("Any acts of the defendants that suggest that they may have decided to treat the roads separately in order to avoid the requirements of federal law will weigh very heavily in support of the project splitting theory."). Aside from unsubstantiated allegations and conjecture, the only specific evidence of the federal government's purported segmentation to which Plaintiffs point is contained within a letter, dated December 22, 1997, from the FHWA to the mayor of Charlottesville. In the letter, which discusses a prior, more wide-ranging federally funded project for the area in and around the Park, the FHWA mentions that the draft EIS ("DEIS") that had been prepared was converted to an EA

> because the scope of the project had been scaled back from 2.3 miles to 1.4 miles by eliminating the portion of the proposed project south of the Route 250 Bypass. By reducing the scope, the potential significant adverse impacts identified in the EIS and associated with the proposed project were eliminated.

AR 11670, Bates # 069007–08. Plaintiffs, who highlight the FHWA's use of the phrase "scaled back," describe this statement as "strong evidence" that the project was deliberately segmented in order to evade NEPA's EIS requirement.

I cannot agree with Plaintiffs' contention. First, as Defendant has pointed out, the project for which federal funding was being contemplated in the 1990s is distinct from the present Interchange Project, with which the federal government only became involved in 2004. Second, Plaintiffs seek to establish a causal link that is unsubstantiated. The letter from the FHWA to the mayor of Charlottesville does not state that the project was scaled back so that the DEIS could be converted to an EA; rather, it states that the DEIS was converted to an EA because the project's scope had been reduced. In other words, Plaintiffs infer a motive—namely, that the FHWA was looking for a way to shirk NEPA's EIS requirement—for which there is no evidence. Third, the fact that the FHWA had originally prepared a DEIS belies the notion that the FHWA was trying to avoid the EIS requirement of NEPA. Indeed, had the FHWA been keen on skirting the more

43

rigorous demands imposed by the preparation of an EIS, one would assume that the Agency would have segmented the project from the outset in order to avoid preparation of the DEIS altogether.  Finally, the letter avers that the project was scaled back "by eliminating the portion of the proposed project south of the Route 250 Bypass."  AR 11670, Bates # 069007–08.  And yet today, the only construction that is proposed to take place south of the Route 250 Bypass is unequivocally part of the Interchange Project.  Thus, even if I were to assume, *arguendo*, that the letter is evidence of segmentation, it only evinces segmentation of a separate project that no longer exists in its former mold.  Indeed, the letter does not reference the MRE, which is the portion of the "single facility" that Plaintiffs assert has been segmented from the Interchange Project.  Ultimately, the statements in the letter are far from enough evidence of a deliberate attempt at segmentation to overcome the considerable degree of deference that the APA requires me to afford to the FHWA's decisionmaking.  *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) ("Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid.").

Because the FHWA adequately considered the cumulative effects on the environment of the Interchange Project, and in light of my finding that the FHWA did not engage in improper segmentation, I will not disturb the FHWA's determination that preparation of an EIS in this case was unnecessary.

### 2. The Scope of the FHWA's Revised Environmental Assessment

Plaintiffs argue that even if the FHWA properly addressed the potential environmental impacts of the Interchange Project with an EA rather than an EIS, the Revised EA issued by the FHWA was nonetheless deficient.  Until these deficiencies are remedied, Plaintiffs claim, the FHWA should be enjoined from proceeding with the Interchange Project.  More specifically,

44

Plaintiffs argue that the Revised EA was lacking in two regards: (1) it failed to disclose or analyze the cumulative impacts of the Project, and (2) it failed to evaluate reasonable alternatives to Alternative G1.

With respect to the former, Plaintiffs contend that virtually no analysis of cumulative impacts was included in the Revised EA, and that anything approaching such is nothing more than vague lip service.  Similarly, Plaintiffs, in effect, reassert their claim that instead of tailoring the scope of the Revised EA solely to the Interchange Project, the FHWA should have evaluated the Interchange Project and the MRE as a single, comprehensive project.

To the contrary, as I have previously stated, I find that the FHWA adequately considered the cumulative effects of the Interchange Project in the Revised EA.  In that document, the FHWA devotes over four pages to a discussion of the cumulative impacts on cultural resources, water quality, habitat and wildlife, public park and recreational facilities, and noise levels.  AR 534, Bates # 004733–37.  Far from being excluded from the assessments in this section, the MRE is routinely discussed.  Indeed, the Revised EA specifically states:

> McIntire Road Extended will also be constructed north of the Route 250 Bypass within McIntire Park, resulting in additional impacts to McIntire Park.  The loss of parkland from McIntire Road Extended has already been replaced by 49 acres of parkland in Albemarle County.  These two roadways would have an additive cumulative effect that would include conversion of park recreational land to transportation uses, increased traffic, and noise through the park, and impacts to habitat and wildlife in the park.

AR 534, Bates # 004736.  Clearly, the FHWA acknowledged that the Interchange Project and the MRE would, if both constructed, produce cumulative impacts.  While Plaintiffs disagree with the FHWA's ultimate conclusion that these effects would not be so significant as to necessitate the preparation of an EIS, and although Plaintiffs preferred a more intensive analysis of these impacts, they cannot seriously contend that cumulative effects were not considered.  In light of the fact that such effects were adequately considered, and because, in doing so, the FHWA did

not act arbitrarily or capriciously, the APA compels me not to disturb the FHWA's findings in this regard.

Separately, as mentioned, Plaintiffs maintain that the Revised EA was deficient in that it failed to evaluate reasonable alternatives to Alternative G1.  Further, Plaintiffs contend that the FHWA's analysis of Avoidance Alternative 2 in the Revised EA was even more inadequate than its analysis of that alternative in the Final Section 4(f) Evaluation.

NEPA requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).  The agency must consider a "no action" alternative, 40 C.F.R. § 1502.14(d), and must ultimately designate a "preferred" alternative, *id.* § 1502.14(e).  Additionally, the FHWA's regulations implementing NEPA require an EA to "identify alternatives and measures which might mitigate adverse environmental impacts."  23 C.F.R. § 771.119(b).  "While the regulations do not specifically address how an agency is to determine the appropriate scope of an EA, some guidance may be found in the provisions that relate to the scope of EIS's."  *D'Agnillo v. U.S. Dep't of Hous. and Urban Dev.*, 738 F. Supp. 1443, 1447 (S.D.N.Y. 1990).  However, "the range of alternatives an agency must consider is smaller than in an [EIS]," *North Carolina v. FAA*, 957 F.2d 1125, 1134 (4th Cir. 1992), for "NEPA does not require that an EA engage in a full blown detailed analysis of all potential alternatives," *Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F. Supp. 2d 1054, 1073 (D.S.C. 2011).  Thus, "whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives."  *Congaree Swamp*, 768 F.

Supp. 2d at 1073 (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citations omitted)).

In the Revised EA, the FHWA describes the development of alternatives for consideration and the screening process it put those alternatives through thereafter. AR 534, Bates # 004692–4701. At the outset of this section, the FHWA lists the rather substantial amount of public and agency involvement between 2005 and 2008 that contributed to the development of alternatives. *Id.* at Bates # 004693. According to the Revised EA, certain alternatives were eliminated from detailed study because they would not satisfactorily address the project's purpose and need, would have unacceptable environmental impacts, or would pose engineering obstacles. *Id.* These discarded alternatives included transportation system management activities,[22] mass transit improvements, and an improved no-build, at-grade intersection. *Id.* at Bates # 004693–94. The last of these alternatives is essentially the same as what came to be known as Avoidance Alternative 2.[23] And as I have previously reviewed in considerable detail, the FHWA determined that Avoidance Alternative 2 did not need to be carried forward because it would not meet certain elements of the Interchange Project's purpose and need. *Id.* at Bates # 004694.

While Plaintiffs might disagree with the FHWA's determination in this regard, it was not unreasonable, arbitrary, or capricious. Indeed, in the course of preparing an EA, an agency need

---

[22] Transportation system management activities "maximize the efficiency of the present transportation system or reduce the demand for travel on the system through the implementation of low-cost improvements." AR 534, Bates # 004693.

[23] Plaintiffs' argue that Avoidance Alternative 2 was given unacceptably scant consideration in the Revised EA because it is only mentioned in a line-item in a table diagram. While Plaintiffs are correct that Avoidance Alternative 2 is only referred to by that moniker in the table diagram and nowhere else, it is not the case that the features that comprise Avoidance Alternative 2 were not considered elsewhere in the Revised EA, for the "upgraded Route 250 at McIntire Road Intersection" discussed on page 7 is the same alternative with a different title. AR 534, Bates # 004694, 004701.

not carry forward alternatives for detailed analysis if they would fail to meet the very objectives

of the given project. *See South Carolina ex rel. Campbell v. O'Leary*, 64 F.3d 892, 900 (4th Cir.

1995) ("[A]n agency is not required to consider alternatives which are 'infeasible, ineffective, or

inconsistent with basic policy objectives' for the action at issue.") (quoting *Headwaters, Inc. v.*

*Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990)).

      To the extent that Plaintiffs also contend that the FHWA failed to adequately consider

other alternatives besides Avoidance Alternative 2 in the Revised EA, I find that the

administrative record tells a different story.  Indeed, thirteen different interchange alternatives

were ultimately developed and considered.  AR 534, Bates # 004694–95.  Of these alternatives,

five were retained for further study, but two of them were thereafter dropped in light of negative

public input.  *Id.* at Bates # 004695.  Ultimately, two of the remaining three alternatives were

carried forward.  *Id.*  Following more input, which included public comment,[24] it was determined

that Alternative G1 would be the preferred alternative.  *Id.* at Bates # 004695–96.  Finally, as

described in the FHWA's Section 4(f) Evaluations, consideration was given to several avoidance

and minimization alternatives.  *Id.* at Bates # 004698.  These alternatives, too, were influenced

by the comments and suggestions of Plaintiffs and other similarly concerned parties.  *See* AR

1368, Bates # 011163–65.  However, these alternatives were rejected for failing to meet the

project's purpose and need criteria.  *Id.*

      Finally, Plaintiffs assert that the FHWA failed to take the obligatory "hard look" at the

environmental impacts of the Interchange Project because the no-build alternative in the Revised

EA assumed that the proposed MRE's southern terminus would be at the Route 250 Bypass as

---

[24] During this consultation process, numerous alternatives suggested by Plaintiffs were taken into account, thus further undermining the notion that inadequate consideration was given to alternatives by the FHWA. *See, e.g.*, AR 1452, Bates # 011628–29.

opposed to 775 feet north of the intersection.[25]  Plaintiffs are correct that, as a general matter, the

accuracy of the no-build baseline is a "critical aspect of the NEPA process," *N.C. Wildlife Fed'n*

*v. N.C. Dep't of Transp.*, --- F.3d ---, No. 11-2210, 2012 WL 1548685, at *6 (4th Cir. May 3,

2012), for without such data, "an agency cannot carefully consider information about significant

environment impacts," *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085

(9th Cir. 2011).  However, I disagree with Plaintiffs' contention that the Fourth Circuit's recent

opinion in *North Carolina Wildlife* compels me to find the FHWA's decisionmaking arbitrary

and capricious because of the inconsistency that ultimately came about regarding the southern

terminus of the MRE.

In *North Carolina Wildlife*, the Fourth Circuit concluded that the agency defendants' EIS

was deficient because the no-build alternative that they utilized assumed construction of the very

project that they proposed to build, and as a result, the defendants incorporated "build"

assumptions into the no-build baseline.  2012 WL 1548685, at *2.  Compounding the problem

was the fact that, in the face of repeated public inquiries into whether the no-build alternative in

fact assumed construction of the underlying project, the defendants either failed to address the

issue or misstated that the project had not been factored into the baseline.  *Id.* at *2–3.  The

Fourth Circuit ruled that by failing to disclose their assumptions, and by supplying the public

with erroneous information, the defendants failed to take the "hard look" at environmental

consequences that NEPA requires.  *Id.* at *7.

However, the facts and circumstances in the instant matter are markedly different from

those in *North Carolina Wildlife*.  The CLRP for the Charlottesville-Albemarle County region,

which was updated in 2009, included the proposed MRE with a southern terminus at the Route

---

[25] In the Revised EA, the no-build alternative is also variously referred to as Alternative A.

250 Bypass.  AR 534, Bates # 004696.  Accordingly, the FHWA reasonably included the MRE in its description of the no-build baseline in the Revised EA, *id.*, which is accompanied by a figure that shows the MRE terminating at the intersection.  *Id.* at Bates # 004697.  Thus, the no-build alternative in the Revised EA assumed the construction of a nearby yet *distinct* project as opposed to the underlying project for which the EA was being prepared.  *See North Carolina Wildlife*, 2012 WL 1548685, at *2; *Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1105 (E.D. Cal. 2006) ("A no action alternative . . . is meaningless if it assumes the existence of the very plan being proposed.").  Moreover, there has been no allegation in the case at hand that this assumption regarding the MRE was hidden from other agencies or not disclosed to the public.  To the contrary, the Revised EA, which was released after a period for public review and comment, very clearly describes the no-build baseline as including the MRE.[26]

Approximately two months after the FHWA issued the Revised EA, VDOT began advertising for construction bids for the MRE, and in the process revealed that it intended the MRE to terminate 775 feet north of the Route 250 Bypass.  Accordingly, the FHWA adapted Alternative G1 so that the northern leg of the Interchange Project would tie into the MRE.  In other words, the Interchange Project would account for the additional 775 feet rather than simply overlaying the MRE.  *Compare* AR 534, Bates # 004704 (showing the northern extension overlapping with the MRE), *with* AR 36, Bates # 000405 (depicting the northern extension meeting the MRE approximately 775 feet north of the intersection).  The FHWA did not, however, amend the no-build baseline to reflect a shift in the southern terminus of the MRE.

---

[26] Significantly, in its Revised EA, the FHWA also included traffic projections under no build conditions without the MRE.  AR 534, Bates # 004692.  As the tables in the Revised EA clearly show, in 2030, the intersection is expected to operate at a LOS F with or without construction of the MRE.  *Id.*

*See, e.g.*, AR 36, Bates # 000404.  Plaintiffs maintain that in so doing, the FHWA violated NEPA.  I disagree.

First, the FHWA's decision not to change the southern terminus of the MRE in its no-build alternative was sound.  In the event that the Interchange Project is not constructed, it is reasonable to expect that the MRE will be built down to the intersection, regardless of VDOT's advertisement, in part because it would be unrealistic to expect VDOT to fund a road to nowhere, but also because, as the FHWA has routinely observed, the CLRP for the area calls for a southern terminus at the Route 250 Bypass.  Thus, the CLRP has been fairly interpreted as a proxy for the City's intent with respect to the MRE if the Interchange Project does not come to fruition.  And accordingly, it was reasonable for the FHWA to assume construction of the MRE down to the intersection both before and after issuance of the Revised EA.  Second, *North Carolina Wildlife* is not inconsistent with such a finding and does not compel a contrary outcome.  In that case, the FHWA assumed construction of the very project being proposed in the formation of its no-build baseline, and misinformed the public about having done so.  In the case at hand, however, a MRE terminating at the intersection has consistently been assumed and disclosed to the public.  Indeed, by leaving the no-build alternative unaltered following VDOT's advertisement, the FHWA has actually conveyed to the public a more realistic view of the environmental impacts under a no-build scenario, because even without construction of the Interchange Project, the MRE is likely to be built down to the Route 250 Bypass.  An amended no-build baseline that did not assume as much would have been disingenuous.  For these reasons, I find that the no-build alternative used by the FHWA in the Revised EA did not suffer from the inaccuracy that plagued the EIS in *North Carolina Wildlife*.  As such, the no-build alternative

provided an adequate baseline for comparison of alternatives and did not result in arbitrary or capricious consideration of those alternatives.

In the end, there is sufficient evidence in the Revised EA that the FHWA engaged in an objective analysis of the reasonable alternatives that it developed or which were proposed to it.[27] For that reason, as well as those grounds set forth above, I find that the FHWA's Revised EA does not suffer from the deficiencies claimed by Plaintiffs; rather, it stands as a proper assessment of the Interchange Project's cumulative effects and alternative design proposals. Ultimately, the NEPA process "involves an almost endless series of judgment calls." *Dole*, 826 F.2d at 66. To be sure, it is "always possible to explore a subject more deeply and to discuss it more thoroughly," but "[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Id.*

At bottom, reviewing courts are to assess whether an agency subject to the mandates of NEPA took the requisite "hard look" at environmental impacts. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). In its Revised EA, the FHWA did so. Accordingly, I will neither displace the FHWA's considered conclusion that preparation of an EIS was not required, nor will I enjoin the Interchange Project from proceeding on the basis of Plaintiffs' contention that the Revised EA is inadequate, for I find that the analyses contained within it have been sufficiently and rationally performed.

---

[27] Plaintiffs imply that the FHWA gave alternatives, including Avoidance Alternative 2, short shrift because it preferred Alternative G1 from the get-go. Not only do I find an absence of evidence in the administrative record to support this theory, but I also observe that even if it were true that the FHWA had such a penchant, that fact in itself would not necessarily be impermissible, for "NEPA does not require that agency officials be subjectively impartial," but only that "projects be objectively evaluated." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (citation and internal quotation marks omitted). Indeed, "NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements . . . to insure that there is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by the plaintiffs . . . ." *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 470 F.2d 289, 295 (8th Cir. 1972) (citation and internal quotation marks omitted).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment will be denied and Defendant's cross-motion for summary judgment will be granted.   An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.


Entered this ___29th___ day of May, 2012.


NORMAN K. MOON
UNITED STATES DISTRICT JUDGE